Nicoll
v.
Trustees of
Huntington.

NICOLL, *an infant, by his guardians, &c. against* THE
TRUSTEES, &c. *of the Town of Huntington.*

*June* 22–27th,
and *August*
29th.

The peculiar state of property, and the oppressive nature of the litigation at
law, as to the title, affords a proper ground for the equitable jurisdiction of
this court. And the party may either come into equity, first to have his
title tried at law, under its superintendance, or he may have the title estab-
lished at law, before he comes to this court; and where the title is once es-
tablished to the satisfaction of the court, either upon its own view of the
testimony, or by verdict on one or more issues, awarded at its discretion, it
will declare in whom the right exists, by a decree, and protect that right by
a perpetual injunction. But if the plaintiff, from his own case, does not
show enough, or fails to make out a title, by evidence, his bill will be dis-
missed without awarding an issue.

The patent to *William Nicoll,* of the 4th of *June,* 1688, of certain islands on
the south side of *Long Island,* does not extend to *Captree Island, Oak
Island,* and *Grass Island.*

Costs, in equity, do not always follow the event of the cause; but are awarded
or not, according to the justice of the case, in the sound discretion of the
court. And where a plaintiff had probable cause for seeking the aid of the
court, but failed in establishing his title; but the defendant showed none or
no better title to the property in dispute, the bill was dismissed without
costs on either side.

THE *bill,* which was filed in *May,* 1806, stated that
letters patent were granted, on the 4th of *June,* 1688, to
*William Nicoll,* the ancestor of the plaintiff, " for all those
islands, and small isles of sandy land and marshes, or mea-
dow ground, with the appurtenances, situate, lying, and be-
ing on the south side of *Long Island,* between the *Inlet,* or
*Gut,* commonly called *Huntington Gut,* and the lands of the
said *Nicoll,* at a certain river called *Conetqunt,* in the bay,
or sound, that is, between the firm land of *Long Island* and
the beach, together with all and singular, the lands, mea-
dows, marshes, moors, waterponds, hawking, hunting, fishing,
and fowling, and all the rights, profits, hereditaments, and
appurtenances, to the said islands, isles, and premises be-
longing, or in any wise thereto appertaining."

That the islands, so granted, are known by the names of
*Fire Island*, *Captree Island*, *Oak Island*, and *Grass Island*,
the three last of which are the subject of controversy in the
cause. The patentee took possession of the islands, and
transmitted them, by descent, to the great grandfather of
the plaintiff, who was seised thereof in 1745. In *August*,
1778, he made his will, and devised the islands to *William
Nicoll*, the grandfather of the plaintiff, for life ; remainder to
the father of the plaintiff, for life ; remainder to the first son
of the plaintiff's father, in fee tail ; and, afterwards, died.
The plaintiff's grandfather entered on the premises, under
the will, in 1780, and continued in possession until his death,
in 1796. The plaintiff's father then entered as tenant for
life, and continued in possession until his death, in 1799,
when the plaintiff, then *en ventre sa mere*, became seised of
the premises in fée tail, and which was converted into a fee
simple, under the will, by virtue of the act abolishing entails.
(See *Stedfast* v. *Nicoll*, 3 *Johns. Cas.* 18.)

That the premises in question, from the remotest period,
until about twenty or thirty years ago, were merely resorted
to for fishing and fowling, with or without the permission of
the owners ; that they are incapable of being inhabited or
enclosed, being at a considerable distance from the main
land of *Long Island ;* that they produce large quantities of
grass and herbage, and have lately become valuable ; that,
for forty years, and upwards, the ancestors of the plaintiff
used the islands, as owners thereof, by leasing the same, and
giving permission to persons to cut the grass ; that the lands
of the plaintiff, at *Conetqunt* river, (between which, and the
gut called *Huntington Gut*, the islands, granted in the pa-
tent, lie,) are situated eastward of *Fire Island*, which is the
easternmost of the four islands ; that *Huntington Gut* was
a water passage through the beach, from the bay to the
ocean, west of the westernmost of the four islands ; that the
guts through the beach to the ocean are fluctuating and
changeable, sometimes filling up, and new ones opening, al-

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON

ways further to the westward; and those that remain, gradually work to the westward, so that it is now difficult to ascertain where the gut, called *Huntington Gut,* in the patent, was, in early times, situated; and that the gut, so called *Huntington,* does not now exist, at least, at the place where it was when the patent issued.

That, on the 30th of *November,* 1666, letters patent issued, granting and confirming unto the freeholders and inhabitants of the town of *Huntington,* their heirs and successors, " all the lands which had already been, or thereafter should be, purchased for, and on behalf of the said town, whether from the native proprietors, or others, within the limits and bounds therein expressed," to wit, " from a certain river or creek, on the west, called by the *Indians, Nakaquatick,* and by the *English,* the *Cold·Spring,* to stretch eastward to the *Nasiquack* river; on the north to be bounded by the *Sound,* and on the south, by the sea, including there, nine several necks of meadow ground," &c.

That these nine necks of meadow ground form part of the shore of *Long Island,* on the north side of the bay, in which the said islands are situate; and counting from the eastern boundary line of the town of *Oysterbay,* which is the western line of *Huntington,* the nine necks of meadow ground will not extend so far eastward as the most westerly of all the four islands.

On the 2d of *August,* 1688, letters patent were issued, confirming unto the freeholders and inhabitants of *Huntington,* the lands mentioned in the last patent above stated, and constituting the grantees a corporation, &c.; and saving to the king all necks of land not purchased of the *Indians.*

That, on the 5th of *October,* 1694, the inhabitants of *Huntington* applied to the governor of the province of *New-York,* for a grant and confirmation of the premises mentioned in the first patent, so far only as that the limits and bounds of their town should not be as above mentioned, but as hereafter expressed, viz. " all those tracts and necks of land

lying upon *Long Island*, within the county of *Suffolk*, bounded on the west by a river called *Cold Spring*, and a line running south, from the head of *Cold Spring*, to the south sea; on the north, by the sound; and on the east, by a line running from the west side of *Fresh Pond*, to the west side of *Whitman's Dale;* from thence to a river on the south side of the island, on the east side of a neck called *Sampawwams*, and from the said river south to the south sea." Letters patent of grant and confirmation, were accordingly issued, and the freeholders and inhabitants of the town incorporated within those limits.

That the eastern boundary line of the town of *Huntington*, as described in the last-mentioned letters patent, is not so far eastward as the most westerly of the said islands; and that the boundaries of *Huntington* have ever since been according to the bounds described in the said patent.

That, until within twenty or thirty years last past, those islands were regarded of little value, and the owners did not take much pains to obtain the products of them exclusively; that, consequently, some of the inhabitants of *Huntington* cut, and carried away, grass from them; but when, in later years, the products became more an object of attention, the ancestors of the plaintiff asserted their right, and brought actions of trespass against persons acting under the town of *Huntington*, for entering, cutting, and carrying away the grass, which suits were brought before justices of the peace, and uniformly determined in favour of the plaintiff's ancestors; and the defendants in those suits never pleaded any title. But, lately, the defendants have set up their title to those islands, as part of the *common* lands of *Huntington*.

That, in 1802, *Zebulon Smith* having entered on *Captree* island, and cut and carried away grass, in defiance of the plaintiff's right, and *J. Jarvis*, and *T. Smith*, having, also, done the same, actions of trespass were brought against them by the guardians of the plaintiffs, before a justice of the peace, and they all pleaded titles under the town of *Hunting-*

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON.

*ton;* and the causes were, afterwards, removed to the supreme court, and the defendants respectively pleaded that the *locus in quo* was the freehold of the trustees of the freeholders and commonalty of the town of *Huntington.* The plaintiff replied the freehold in himself, and the possession thereof by his guardians, and *traversed* the title set up by the defendants, on which issue was joined, and one of the causes tried at the *Suffolk* circuit, in 1805, and a verdict found for the plaintiff; the other two causes were not tried for want of time.

That *Jesse Weeks,* pretending title to the islands in question, under the town of *Huntington,* brought actions of trespass against *Peter Monfort* and *Elias Leek,* who entered thereon, under the plaintiff, which actions were still pending. That the defendants persisting in their claim to the said islands, declaring their intention to enter thereon, and to encourage others to enter, and cut, and carry away, the grass, &c., in despite of the plaintiff's title, so that the plaintiff will be forced to abandon his rights, or be led into a *multiplicity of suits, and to great expense.*

That owing to the great changes which have taken place in the beach, between the bay and the ocean, and the guts or water passages through the same, since the letters patent were issued, the *Huntington* gut cannot be located without the testimony of *aged witnesses.* And the bill, therefore, prayed that their testimony might be *perpetuated ;* and that the title of the plaintiff might be established by a decree of this court; and that the defendants may be restrained by an *injunction* from further entering on the islands, and taking the profits; and that the suits against *Monfort* and *Leek,* also, be enjoined; and for further and other relief, &c.

The *answer* of the defendants admitted the patent to *Nicoll,* in 1688, but insisted that it covered *Fire Island* only, and not the others. They denied that any of the ancestors, or guardians of the plaintiff, ever had seisin or possession of, or right to, the other islands, but admitted the chain of descent,

as stated, and the title to *Fire Island;* that the four islands
are uninhabitable, and were only useful for the grass, &c.;
and denied any use by the plaintiff, or his ancestors, or
ownership, except as to *Fire Island.* The defendants denied
that *Huntington Gut,* mentioned in the patent to *Nicoll,* lay
west of the four islands, and averred that it was the same as
the one now called *Fire Island Inlet,* and, sometimes, for-
merly, the *Great Gut;* and was, from the earliest settlement
of the country, known by the name of the *Huntington Gut.*
They admitted the changes of the guts, as stated by the
plaintiff; that *Huntington Gut,* in the patent, is now called
*Fire-Island Inlet,* and was never filled up, and that no other
gut was ever called by the name of *Huntington.*

They admit the patent and confirmation to the town of
*Huntington,* in 1666, and that, counting east, the nine necks
will not include either of the four islands; but they insisted
that the nine necks were not contiguous, but were so many
necks as had been purchased of the *Indians,* and that some of
them were as far *east* as the bounds of *Huntington;* that the
three islands are embraced by the patent of *Huntington;* and
that the freeholders, &c., took possession of them as such,
and continued in possession, until the patent of the 2d of *Au-
gust,* 1688. They admitted the patent of confirmation in 1694,
and that the bounds of the town are as therein described;
and that the eastern boundary line of the town, as set forth
in the patent, is not so far east as to embrace the three islands,
or either of them. The defendants insisted, that the inha-
bitants of *Huntington* have always claimed and exercised
ownership, and, for twenty years past, have let out the lands
yearly; and that no adverse claim was set up, until about
eighteen or twenty years ago, when the plaintiff's grand-
father made claim to those islands; and about twelve years
ago, he brought actions of trespass against persons entering
on the islands under the defendants, before justices of the
peace; and the defendants pleading title, the causes were
removed into the county court, but were not prosecuted fur-

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON.

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON.

ther. That the guardians of the plaintiff brought three ac-
tions of trespass, as stated by the plaintiff, but the defendants
in those suits did not plead, or rely on the title of the town
of *Huntington*, but on the want of possession in the plaintiff;
and that the defendants insisted on their right, and a posses-
sion of the three islands, for above one hundred years. They
admitted, that suits were brought against *Smith* and others,
and a verdict found in one of the suits, for the plaintiff; but
that such verdict was against the evidence, which was con-
tradictory. They admitted that they persisted in their
right, but denied any intention to force the plaintiff to aban-
don his claim, by a multiplicity of suits; and they objected
to the examination of witnesses *in perpetuam rei memoriam*,
and to the prayer of the bill.

It is unnecessary to state the mass of evidence taken in
the cause. The material parts of it will be found in the
opinion delivered by the court.

In 1807, the Chancellor having ordered an injunction to
restrain *Weeks* from proceeding in the suits brought by him;
and, also, that the guardians of the plaintiff should be ex-
amined as witnesses in the cause, *appeals* were entered on
those orders; and, in *Februdry*, 1808, the court of errors
dismissed the appeal, and remanded the cause. (Vide S. C.,
3 *Johns. Rep.* 566—608.)

This cause was first brought to a hearing, on the plead-
ings and proofs, before the late CHANCELLOR, in 1809,
who, without entering fully into the merits, awarded a
feigned issue, to be tried in *Queen's* county, by a spe-
cial jury, at the circuit of the supreme court. By the di-
rections for the feigned issue, the right of *Nicoll* only, to
the islands in question, was to be tried, without any inquiry
into the title of the town of *Huntington*.

The feigned issue was accordingly made up, and tried
before the present *Chief Justice*, in *June*, 1811, and a ver-
dict was found against the plaintiff's title. The judge certi-
fied, that he was satisfied with the verdict; and that he

was of opinion, and so declared to the jury, on the trial, that neither the plaintiff, nor the trustees of the town of *Huntington*, had any title to the premises in question, upon a just location of their respective patents.

In *August*, 1811, the plaintiff petitioned for a rehearing, and, also, moved for a new trial of the feigned issue, which last motion stood over, by order of the court, until the question as to a rehearing should be decided ; because, if a rehearing should be granted, a new trial would be unnecessary.

The petition for a rehearing stated, as grounds for the application, that the Chancellor had erroneously excluded some affidavits which had been offered in evidence on the part of the plaintiff; and that the feigned issue, as directed, had only brought the plaintiff's title in question, without, at the same time, inquiring into the title of the defendants.

In *December*, 1811, the Chancellor ordered a rehearing of the cause.

In *May*, 1812, a petition was presented, on the part of the plaintiff, to dismiss *William Udall*, as one of the guardians of the plaintiff, to the end that he might be a competent witness for the plaintiff in the cause, the plaintiff offering to give security for costs, if required ; and the guardian was, accordingly, dismissed.

In *October*, 1812, the plaintiff petitioned the court for an order for leave to examine further witnesses in the cause, to establish facts discovered since the former hearing, and to examine *William Udall*, late one of the plaintiff's guardians, and who could not, while guardian, have been examined ; and in support of this application, the following cases were cited : *Callon* v. *Mince, Prec. in Chan.* 234. 2 *Vern.* 472. *Sanford* v. *Paul*, 3 *Bro. C. C.* 370. 2 *Dickens' Rep.* 750. *Cursus Cancellariæ*, 281. *Mayor, &c. of London* v. *Dorset*, 1 *Ch. Cas.* 228. In *January*, 1813, the late Chancellor granted the prayer of the peti-

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON.

tion, and *Udall*, and several other witnesses, were examined in the cause, in behalf of the plaintiff.

The cause was finally brought to a hearing on its merits, before the present Chancellor, the 22d of *June* last; and was argued by *Harison* and *Riggs* for the plaintiff; and by *T. A. Emmet* and *Wells*, for the defendants.

*For the plaintiff*, it was contended, 1. That the plaintiff had a right to the equitable interposition of this court on account of the *difficulties* attending a remedy at law; that a court of chancery has jurisdiction, and it may decide questions of law and fact, without a jury, and though such questions relate to lands or goods. (5 *Br. P. C.* 369. 8 *Br. P. C.* 399. 5 *Vesey*, jun. 671. *Cur. Cancell.* 344. 6 *Cranch's Rep.* 22. 1 *Johns. Cas.* 436. 3 *P. Wms.* 294. 2 *Vesey*, 552. 1 *Vern.* 287. 292. 1 *Ch. Cas.* 155. 1 *Schoales & Lefroy*, 413.)

Besides, it appeared that the plaintiff had already established his title at law, before he applied to this court.

2. That the first patent to the inhabitants of *Huntington* did not include the premises; that the *bay* is an *arm* of the *sea*, and is to be considered as the *sea*, in the meaning of the patent. (1 *Harg. Law Tracts*, 10—18.) The second patent was similar to the first. The third patent contracts the limits of the town, on the north, and enlarges them on the south; and the defendants admit that this patent does not cover the premises. This patent was, in law, a *surrender* of the two former patents; and if so, there must be an end of the title of the defendants. (20 *Vin. Ab. Surrender*, 125. s. 5. 128. s. 9, 10. 129. s. 11, 12. 131. s. 25. 29. 6 *Co.* 69. *b.* 10 *Co* 67. *b.*) If the defendants have no title, the plaintiff, having shown a possession, must prevail.

That from the evidence in the cause, no further issue or trial could be necessary to enable the court to decide in

favour of the plaintiff. But if any issue should be directed, it ought to be so framed as to inquire into the title of the defendants, as well as that of the plaintiff; for, if neither party had a title, the property was in the state : and this result would have great influence as to awarding costs. But it is enough for the plaintiff to show a possession, or colourable title.

*For the defendants*, it was insisted, that this was not a case of original equity jurisdiction. It was strictly matter of legal cognizance, of which chancery entertains jurisdiction incidentally, in order to prevent suits becoming an instrument of oppression by means of endless litigation, but which a court of law has no power to prevent. However clear and uncontradicted the evidence may have been, this court could not decree, without directing an issue at law. The suit is in the nature of a *bill of peace*. There have been two verdicts, one for each party. One verdict is not sufficient to decree in favour of the plaintiff. (4 *Bro. P. C.* 692—700.)

2. The third patent was not a surrender of the *fee* granted by the first and second. There can be no surrender of a *fee*, by implication. This is applicable only to lesser estates which can be merged in a greater. (*Co. Litt.* 337. b. 4 *Cruise's Dig.* 155. *tit.* 32. ch. 9. s. 1. 4. 6. *Perkins,* 585. 20 *Vin. Ab.* 123. pl. 5. 144. pl. 3.)

The cause stood over for decision to this day, when the following judgment was pronounced by the court: *August* 29th.

THE CHANCELLOR. The foundation of the bill is the legal right of the plaintiff to the three islands in dispute; and his claim to the assistance of this court arises from the peculiar state of the property, and the oppressive nature of the litigation which it involves. His case states a proper ground of equitable jurisdiction, and if the title he sets up was sufficiently established at law, before he came here, or was

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON.

since established to the satisfaction of this court, either upon its own view of the testimony, or by verdict, upon one or more issues, to be awarded to its discretion, it would then be the duty of the court to declare that right by decree, and protect it by injunction. But, on the other hand, if the title of the plaintiff fails, on investigation, and I shall be satisfied, from all that appears in the case, that is not well founded, it would then be useless to put the parties to the expense of another feigned issue. The bill would have no real ground of support, and ought to be dismissed.

I have accordingly been led to direct my first and principal attention to the testimony bearing on the plaintiff's title.

His title rests upon the construction and location of the patent of 1688, to *William Nicoll*, his ancestor. There was no possession of the islands by any person, except occasional entries, and these were not so exclusive, steady, and certain, as to amount to evidence of right, and to supersede the necessity of paper title.

The words of the patent are easily and obviously satisfied according to the present physical state of that part of the country, without resorting to the pretensions of the plaintiff. Indeed, it is impossible to cast the eye upon any modern and accurate map of *Long Island* without being struck with the impression, that the plaintiff's construction of his patent is violent and unnatural ; and nothing can reconcile us to it, but satisfactory proof that the beach on the south side of that island has undergone some great change since the date of the patent. There is a cluster of low islands, or small isles, which are separated by water, when the tide is full, but not so when the tide is down, and which are called *Fire Island*, or *Fire Islands*, and they lie *between a very noted and large inlet, or gut, and the lands of Nicoll.* It is admitted, on all sides, that they are included in the patent ; and if that gut was *in esse*, at the time of the patent, it would seem, very naturally, to have been the one intended.

1814.

NICOLL

v.

TRUSTEES OF
HUNTINGTON

The words of the patent are, " all those islands, and small isles, of sandy land and marsh, or meadow ground, with the appurtenances, situate, lying, and being, on the south side of *Long Island*, between the inlet or gut, commonly called *Huntington Gut*, and the lands of the said *Nicoll*, at a certain river called *Conetqunt*," &c. If the above inlet, now existing and generally known by the name of *Fire-Island Inlet*, be the one referred to in the patent, by the name of the "gut, commonly called the *Huntington gut*," it puts an end to the plaintiff's claim. To this point a great part of the testimony in the cause has been directed. On the part of the plaintiff, several witnesses have been examined to prove that, for the last 40 or 50 years, or as long as they can well remember, this *Fire-Island Inlet* has been known by the several names of *Fire-Island Inlet*, or *Gut*, the *Great Gut*, *Nicoll's Gut*, or *Nine-Mile Gut* ; but not by the name of *Huntington Gut*. The testimony of *Garret Kettletas, Israel Howell, Jacob Willet, Isaac Thompson, Daniel Jarvis, Epenetus Wood, Daniel Udall*, and *Richard Udall*, goes to this fact. On the other hand, there are several witnesses examined on the part of the defendants, who testify to the same length of time, and that *Fire Island Inlet* was known, as well by the name of *Huntington Gut*, or *Huntington East Gut*, as by the other names above mentioned. This appears from the testimony of *Luke Ruland, Moses Wicks, Caleb Saxton, James Pearsall, Gilbert Wickes, Joseph Ruland, Joseph Ketcham*, and *Arthur Dingee*. There may be a few more witnesses on one side or the other, whose testimony has some relation to this point ; but it is unnecessary to be more particular. The weight of this testimony, in respect to the name, is on the side of the defendants, from this circumstance, that the witnesses on that side speak affirmatively, as to a fact within their knowledge, of the name of *Huntington Gut*, or *Huntington East Gut*, and the plaintiff's witnesses can only speak negatively of their having no knowledge of any such name so applied. But after all,

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON

there is much uncertainty in the attempt to designate the gut, by the shifting and changing *names* used within the last fifty years. The patent goes back 125 years, and speaks of the name *then* commonly given to the inlet.

The plaintiff has, however, proved affirmatively, by several witnesses, as *Garret Kettletas, Isaac Howell, David Willet, John Arthur,* and *Epenetus Wood,* that there was formerly a gut to the westward of the islands in dispute, and now filled up, which was called *Huntington Gut.* On the other hand, it is proved by *Caleb Saxton, Gilbert Wickes, Joseph Ketcham,* and *Richard Udall,* that *Gilgo Gut* (and which now appears on the maps to be west of the town of *Huntington*) was anciently known by the name of *Huntington West Gut,* or *Huntington Gut ;* and one of them said it had been called *Huntington West Gut* by old whalemen, who have been dead forty years ; and another said, that the temporary gut, opposite *Cedar Island,* was called *Huntington West Gut,* as contradistinguished from *Fire Island Inlet,* which was called *Huntington East Gut.*

With respect to this intermediate gut, between *Fire-Island Inlet* and *Gilgo Gut,* (the two plain and noted inlets, which, and none other in that quarter, are known to modern times and modern maps,) it appears to have been very temporary, and soon disappeared. The whole testimony concerning it, is loose tradition, and involved in darknes and fable. *Jacob Seaman* says, that about fifty years ago, the ocean broke through the beach, between *Fire-Island Gut* and *Gilgo Gut,* with great violence, and formed what was called *Cedar-Island Gut,* but which in a few years was filled up, and gone. *Isaac Thompson* speaks, also, but loosely, of a gut called *Huntington Gut,* between *Cedar* and *Oak Islands,* now disappeared ; and he says, that within his memory, the water has several times broke through the beach, and that the inlets afterwards closed up. Though several of the plaintiff's witnesses have designated one of these intermediate and temporary guts, as having been

known by the name of *Huntington Gut*, yet, I think, we must be governed by mere conjecture, in fixing on any of these transient inlets as the inlet intended by the patent of 1688. Why should we be seeking, through the most vague and contradictory traditions, for some extinguished inlet, which may enable the plaintiff to embrace islands lying far west, and *collateral* to his lands, when we have, in front of his farm, a large inlet of unknown antiquity, which includes *between it and his lands* the little islands lying *against* or *opposite* his lands, and which so readily corresponds with the words of the patent?

But it is contended, that even *Fire-Island Inlet*, though now nine miles wide, did not exist at the date of the patent. If this be really so, we are then reduced to the necessity of exploring in the dark for the inlet in question. The bill admits, that it is now difficult to ascertain the one intended. To prove the commencement of *Fire Island Inlet* since 1688, the testimony of *John Arthur* and *Richard Udall*, is relied on. The first witness says, that he always understood, from a boy, (and as he said this in 1770, and was then seventy-four years old, he must refer back to within thirty years of the patent,) that *Fire-Island Inlet* broke through after *Nicoll* settled there, and that it used to be called the *New-Gut.* The other witness says, that old Mr. *Willis* told him, that he had been informed by his ancestors, that *Fire-Island Gut* broke through in the winter of 1690, or 1691, in a storm. This, at best, is improbable, and rests on foundations too weak. The sudden existence of such a grand inlet as that, known in the memory of the oldest witnesses by the names of the *Great Gut* and the *Nine Mile Gut*, and which was a passage for privateers during the revolutionary war, must have been ascertained with much greater historical certainty; for it would have been regarded as a remarkable phenomenon in the natural history of the country. The inlet may, probably, have extended itself gradually towards the west. Several of the witnesses attest to this, and the fact

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON

applies equally to *Gilgo Gut ;* but this progress must have been very gradual, for *Isaac Thompson,* who lived opposite *Fire-Island Inlet* forty-nine years, says, only, that from the appearances and changes within his knowledge, he thinks it quite probable that, formerly, the east shore of the gut was as far eastward as the end of *Fire Island.* If this was so, then the description in the patent applied most precisely to the *Fire Islands,* and to them only.

The patent to *William Smith,* in 1693, is a most important *item* of testimony, in the consideration of this question of fact ; with me, it has all the preponderance so just1y due to written, over parol proof, especially when we are referring to times far beyond the memory of man. That patent was for lands bounded west on *East Conetqunt* river, and east on *Mastick* river, and down on each side to the main sea, with the islands in the bay, " from a certain gut, or inlet, westward, commonly called *Huntington East Gut,* to a place on the beach, eastward, called *Cuptuange,* being the west bounds of *Southampton ;* the beach and bay being twenty-four miles east and west." The present *Chief Justice,* who tried the feigned issue heretofore awarded in this cause, on the point whether the title of the three islands was in the plaintiff, certified, that this patent to *Smith* was offered in evidence upon the trial, and was located by parol proof ; and that it appeared that the gut, in the patent to *Smith,* called *Huntington East Gut,* was the same with the one mentioned in the pleadings and testimony in this cause, by the name of *Fire-Island Inlet ;* and that running west from the west bounds of *Southampton,* the twenty-four miles would terminate some distance to the east of *Fire-Island,* making the probable width of the gut, at the date of the patent, from three and a half to five miles, being nearly the width of *Nicoll's* land on *Long-Island.* He further certified, that he told the jury, if *Huntington East Gut,* in the patent to *Smith,* was the same with *Huntington Gut,* in the patent to *Nicoll,* the islands in question were not included in his

patent, and that he was of that opinion, and so told the jury, who accordingly found a verdict for the defendants. This patent to *Smith* does away all pretence of the creation of *Fire-Island Inlet*, by some violent action of the sea, since 1688; for, if it existed in 1693, and was then a familiar passage, " commonly called *Huntington East Gut*," it is quite certain it was not " the new gut," suddenly brought into existence by a storm, within the two or three preceding years.

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON.

From this view of the case, I am perfectly satisfied that the patent to *Nicoll* does not extend to *Captree, Oak,* and *Grass Islands,* and there is no need of any further issue to inform and satisfy my judgment. I have given the plaintiff the benefit of the testimony excluded on the issue; for I have taken it all into consideration in forming my conclusion.

I have not placed reliance on the evidence which the plaintiff has given, of the use and possession of the islands, because, as I have already observed, (and the fact appears abundantly in the testimony,) the islands are not capable of any other possession, occupancy, or real use, than occasional and periodical entries to cut the grass and sedge; and the testimony as to this use, is quite as strong, if not much stronger, in favour of the defendants. ' Several witnesses have testified to the claim and use of the islands, by the plaintiff and his ancestors, from the time of the lease to *Howell* and *Smith,* in 1768, down to the time of filing the bill; but as many, and, perhaps, more witnesses, testify to a similar claim and occupancy, during the same period, by the defendants, and those claiming under the town of *Huntington,* the result is, that possession must be adjudged to belong to, and to be in, the party who has the right; and as the plaintiff has no title, he has no lawful possession. The equity of his bill has totally failed.

It cannot be material whether the title set up by the defendants be good or not, as to the point of the dismissal of

1814.

NICOLL
v.
TRUSTEES OF
HUNTINGTON.

the bill. If they have no title, yet the bill must be dismissed, because the plaintiff has no title, and, consequently, no equity to support his case. But it is a very different question, whether the bill shall be dismissed with, or without, costs. On this question, I have felt some embarrassment. Costs are always discretionary in this court. They are awarded, as Lord *Hardwicke* has observed, (2 *Atk.* 552.,) not from any statute authority, but from conscience, and *ex arbitrio boni viri*, as to the satisfaction due on one side or the other. A general denial of costs, in all cases, would be holding out encouragement to great vexation, without any recompense, and therefore, costs usually follow the justice of the case ; but they do not always follow the event of the cause. There are cases in which costs have been denied, though the plaintiff failed, when he had probable cause of suit. (*Trethewy* v. *Hoblin*, 2 *Ch. Cas.* 9.) So, where infant heirs revived a cross bill, and entered into very long and expensive examinations, to set aside a deed, and failed, yet costs were denied against them, as they had probable cause to contend. (*Shales* v. Sir *John Barrington*, 1 *P. Wms.* 481.)

In the present case, it strikes me that the plaintiff had probable cause to come here. His ancestors had maintained a long and steady claim to the islands in dispute, and had leased one of them as early as the year 1768. He had also succeeded at law in an action of trespass, tried at the *Suffolk* circuit, in which he had alleged a seisin in himself, and the defendant had alleged a freehold in *Huntington*, and on the traverse of the defendant's title, the issue had been found for the plaintiff. Other trespass suits between the parties were still pending ; and, with respect to the merits of the case, as it appears before this court, the defendants, when brought in, deny the plaintiff's title, and set forth the patents under which they claim an exclusive title to the premises. The issue awarded here was upon the title of the plaintiff, but the defendants' title was brought into view, and to the notice of

the court, by the pleadings; and on the trial of the issue, and
on the argument in this court, the learned judge before whom
the cause was tried, certified, that he gave it as his opinion
to the jury, that the patents under which the defendants
claimed did not cover the islands in dispute.    I do not wish
to give any decided opinion on that point.    When a cause
resolves itself into a dry legal question, the proper *forum*
for the determination of it is a court of law, and I only notice
that title here  incidentally, as it serves to guide  me  in the
exercise of a suitable discretion as to costs.

It is admitted that the last patent to *Huntington* does
not touch the islands.    If the defendants have a title, it is
under their first patent, of 1666,  and the terms of  it are ex-
tremely vague as to the southern boundary,  and the better
opinion is, that it is limited, in breadth, to the " nine several
necks of meadow ground;" if that be so, the premises
are excluded.    These necks are undoubtedly to be taken
in continuity.   *Ad proximum antecedens fiat relatio.*   It
is a general principle, in the construction of written instru-
ments, that a particular specification will exclude things not
specified.    But, whatever doubts might have existed  under
this patent, I consider them as  removed by the  last patent
of 1694, which was granted on the petition of the inhabitants
of *Huntington,* and was intended as a substitute for the pre-
ceding patents, "so as that the limits and bounds of their
town should not be as above  mentioned, but as hereafter ex-
pressed."    The clear definition and location of the southern
boundaries of  their town, by this last patent, certainly con-
cludes the inhabitants of *Huntington* from resorting to the
vague and indefinite description of the former patents, even
if we suppose, in opposition to the  usage under our govern-
ment, that there are technical difficulties in the way of a
legal surrender to government of an estate in fee.

If, then, the plaintiff had probable cause for instituting his
suit, and the defendants have been litigating against his claim,
without any better claim or title on their part, I think it forms

1814.    a very reasonable case for the denial of costs on either side.
It is a case of mutual error.

Bill dismissed without costs.