## ARGUED AND DETERMINED

IN THE

# COURT OF COMMON PLEAS,

FOR THE

## CITY AND COUNTY OF NEW YORK.

---

RICHARD ATKINSON AND ANOTHER *v.* THE GREAT WESTERN
INSURANCE COMPANY.

Barratry, as a marine term, means an intentional injury to the vessel or to the cargo; or some unlawful, fraudulent, or criminal act, whereby or in the prosecution of which, loss or injury arises to the owners of the vessel or of the cargo, or to the insurers. It does not embrace what in the law is denominated negligence.

The defendant indorsed upon its open policy of insurance, as an additional risk to be covered by the policy, 202 bales of cotton from Augusta, Georgia, to Liverpool, England. The goods were shipped by railroad from Augusta to Charleston, thence to be shipped to Liverpool by the barque Victoria, the master giving a clean bill of lading for the 202 bales, freight having been engaged for the whole by that vessel. For want of room in the Victoria, the master sent 77 bales by another vessel, which arrived safely at Liverpool. Thirty bales of the remainder were stowed in the hold, and ninety bales were stowed on deck of the Victoria, without notice to the shippers, and against the remonstrance of the agent of the owners of the vessel. During the voyage, the ninety bales on deck were thrown overboard to save the vessel. One of the perils insured against by the policy was "the barratry of the master and mariners."

*Held*, in an action against the insurers to recover for the loss of the ninety bales jettisoned, that the act of the master in stowing the cotton on deck, did not amount to barratry within the legal meaning of that term.

*Held further*, that the goods, having been carried on deck without the knowledge or implied consent of the underwriter, they were not within the protection of the policy, and being jettisoned, there could be no claim for contribution upon a general average for their loss.

*It seems,* that the only remedy is an action against the master or his principal for the damages sustained through the negligence of the master in carrying the cotton on deck.

"Barratry" and "negligence," in law, defined and distinguished.

Although the rule is well settled that if the proximate cause of the loss, *e. g.,* jettison of the goods, was the peril insured against, and the remote cause was some act of negligence on the part of the master or mariners, *e. g.,* the stowage of goods on deck, the underwriters are liable, yet the rule does not apply where there has been a deviation or departure, producing a change of risk so material as to discharge the underwriters from the policy altogether.

Where an underwriter insures goods upon a clean bill of lading, there is an implied warranty on the part of the insured that the goods are or will be stowed in the usual and ordinary manner, which is in the vessel's hold, and if this is not done, but the goods are carried on deck, except in a case where that is justifiable, the policy never attaches, for the reason that it is a greater risk than the underwriter agreed to take.

THE action was tried before Judge Van Brunt and a jury. The court directed a verdict for the plaintiffs for $19,361 51, ordering the exceptions to be heard in the first instance at General Term, judgment in the mean time to be suspended.

The action was brought to recover for the loss of ninety bales of cotton, insured by the defendants under an open policy issued to the plaintiffs in January, 1866, and which had been continued by indorsement of successive additional amounts, to a time subsequent to the insurance in question.

The body of the policy insured "R. Atkinson & Co., on account of whom it may concern, in case of loss, to be paid to them in the gold currency of the United States, at and from Columbus and other ports and places in the interior of the State of Georgia, *via* Apalachicola, to port or ports in Great Britain. On cotton—to cover all shipments, their own, or consigned to them, or in which they have an interest by vessels sailing on and after 15th December, 1865. To attach, from time of shipment, and also to cover the risk of fire on cotton in transit while waiting shipment." The enumeration of perils insured against included "barratry of the master and mariners,"—cotton, "valued at $190 per bale unless otherwise agreed." "All approved indorsements, on pass book to apply in all respects to that policy, the same as if indorsed thereon;" also, "to cover such other risks as may be approved and indorsed hereon."

A subsequent indorsement was in these words : " March 5th, 1866. It is understood and agreed that this policy covers from the interior of the State of Georgia *via* the Atlantic as well as the Gulf ports to port or ports in Europe." On the 31st October, 1866, the plaintiffs reported to the defendants as a risk to be covered by the policy, 202 bales of cotton from Augusta, Georgia, to Liverpool, England, valued at $26,260, gold.

The 202 bales of cotton were purchased at Augusta by Branch, Sons & Co., of that place for account of the plaintiffs, and by the latter's order were shipped by railroad to Charleston, thence to be shipped to Liverpool per bark Victoria. Freight of the whole of the cotton was engaged, and the master of the Victoria gave a clean bill of lading for the whole. Seventy-seven bales, however, were left out of the Victoria for want of room, and were sent by the brig Albert, arriving safely at Liverpool. Ninety bales taken by the Victoria, being the ninety bales in question, were carried on deck, and on the voyage were jettisoned in a storm. The plaintiffs in New York had no knowledge of the shipment of these bales on deck until they heard of the loss, by telegraph, on the arrival of the Victoria at Liverpool, and the defendants had no knowledge of it. The rate of premium was fixed as for cargo under deck, and the proof was that the regular rate for deck cargo would be three times as much as for the same cargo under deck.

Street Brothers & Co., of Charleston, agents of the owner of the vessel, knew of the lading of the cotton on deck, and stated to the captain that as he had given clean bills of lading for the cargo, he was bound to carry the cotton under deck, or to provide for it on deck by extra insurance ; that the insurance taken on clean bill of lading would not cover the cotton on deck. The bill of lading in the margin stated that the cotton was insured in the open policy of R. Atkinson & Co., the plaintiffs. By arrangement between the agents of the vessel, the captain, and supercargo, the latter, before sailing, wrote to the consignees of his owners in London, stating that the cotton was on deck, and requesting them to insure the same for $9,000 gold, for account of the vessel.

The defendants at the trial, moved the court to dismiss the

complaint, which was denied, and the defendants excepted. Also to direct a verdict for the defendants, which was denied, and defendants excepted. The court directed a verdict for the plaintiffs, the exceptions to be heard in the first instance at general term.

*Evarts, Southmayd & Choate,* for defendants.

I. Goods carried on deck, without notice to the underwriters, are not covered by a general insurance of merchandise. Even with notice, they must be insured specifically in the policy as on deck, or they will not be covered. Here there was no notice, and it was expressly proved to be wholly unusual to ship cotton on deck. The defendants' policy against perils of the sea and other marine perils never attached. (1 Arnould Ins. 2d Am. ed. 213, and cases cited; *Taunton Copper Co.* v. *Merchants' Ins. Co.* 22 Pick. 108; *Lenox* v. *United Ins. Co.* 3 Johns. Cas. 178; *Wolcott* v. *Eagle Ins. Co.* 4 Pick. 429; *Smith* v. *Wright,* 1 Caines, 44.) By the very terms of the policy, the defendant insures, "Beginning the adventure upon the said goods and merchandises from and immediately following the loading thereof on the said vessel," and within the established sense of the clause, the cotton was never "loaded on board" until stored under deck in the usual manner. It was simply a case of bad and improper storage, a risk not included in the enumerated risks of the policy, or chargeable to the underwriters.

II. The cotton being carried on deck without notice, and jettisoned to save the vessel and other interests, was not lost by barratry. The proximate cause of the loss was the jettison of goods to which the policy against the marine risk, including barratry, had never attached—and the conduct of the master and mariners in making the jettison was not barratrous, but appears to have been unexceptionable. Stowage and carriage of goods on deck without notice, or other bad stowage, is not barratry, and comes within no possible definition of the term, and, besides, the stowage of the cotton on deck was not the proximate cause of the loss, or the cause of it in judgment of

law. (Abbott on Shipping, p. 183; 2 Phil. Ins. p. 603; *Lockyer* v. *Offley*, 1 T. R. 259; *Vallejo* v. *Wheeler*, Cowper, 143; *Lawton* v. *Sun Mutual Ins. Co.* 2 Cush. 500; *Grill* v. *The General Iron Screw Company, Limited*, Eng. Law Rep. 1 C. P. 600; and in Exchequer Chamber, 3 C. P. 476.) (*a.*) That cargo on deck, not insured as such, is not covered by the policy, has been the general rule of commercial law established for ages, in respect to policies containing "barratry" as well as the other marine perils, and this is the first time that a claim so preposterous has been set up. (*b.*) There was no element of fraud or crime in the act of storing the cargo on deck, or any evidence of criminal or fraudulent or evil intent, either to benefit himself or to injure his owners, or even that he acted against his better judgment in so doing. The assent and concurrence of his owners, as represented by their agents and authorized supercargo, is expressly proved. (2 Arnould Ins. pp. 819, 822.) (*c.*) The act of the master, in storing the cotton on deck, bears no resemblance to any of the recognized classes of barratrous acts. (*d.*) There is no such thing as loss of goods by barratry, except by some act which is barratry of the master or mariners against the owner of the ship. If by such an act the owners of goods suffer loss of their goods, they may recover on the barratry clause of their policy, but not otherwise, for no act can be barratry which is sanctioned by the owner of the ship. (2 Arnould, 831; *Stamma* v. *Brown*, 2 Str. 1173; *Nutt* v. *Bourdieu*, 1 T. R. 323.) (*e.*) Where the act alleged to be barratrous is in itself a violation of law or a crime, it is not essential that it should be done by the master for his own benefit or with intent to injure his owners. (*Todd* v. *Ritchie*, 1 Stark. 240; Abbott Ship'g, 184; *Earle* v. *Rowcroft*, 8 East, 126.)

*Augustus F. Smith*, for plaintiff.

I. The act of the master in stowing this ninety bales on deck *was barratry*. He knew that he was violating his duty, and putting the plaintiffs' property in peril. His own consignee warned him. The act was wilful, deliberate, and secret. Barratry is an act of wrong done by the master against the ship and goods. This is the definition of bar-

ratry by Lord Hardwick, in *Lewen* v. *Suasso*, and is said by Arnould to be the tersest and perhaps the best definition of the word. (2 Arnould on Insurance, 821, note h.)

Barratry includes every species of fraud concerning either the ship or cargo, committed by the master in respect to his trust as master, to the injury of the owners or shippers. (*Cook* v. *Commercial Ins. Co.* 11 Johns. 40; *Vallejo* v. *Wheeler*, 1 Cowper, 143; *Knight* v. *Cambridge*, 8 Mod. R. 230; 2 Arnould on Ins. pages 820–822; 3 Kent's Com. 305; 1 Phillips on Ins. § 1074; *American Ins. Co.* v. *Bryan*, 26 Wend. 578; *Boehm* v. *Combe*, 2 Mees. & S. 172.)

II. Under the circumstances of this case, it cannot be claimed that the policy did not cover the ninety bales on deck, for they were covered by the policy the moment they were shipped upon the railroad at Augusta, and as the policy had once attached, the cotton could not be taken from under the protection of the policy by the barratry of the master. When he deliberately put it on deck, knowing that he violated the trust reposed in him, it was barratry, and the defendants were liable.

By THE COURT.*—DALY, Chief Justice.—Among the risks insured against was barratry of the master and mariners, and the question presented in the case is, whether the ninety bales of cotton were lost through an act which the law would denominate barratry on the part of the master.

These ninety bales were stowed upon deck, and were jettisoned in a storm. They were a part of 202 bales covered by the policy, which, by the plaintiff's order, were shipped from Augusta, Georgia, to Charleston, South Carolina, by railroad, thence to be shipped to Liverpool by the barque Victoria, the master giving a clean bill of lading for the 202 bales, the plaintiff's agent having engaged freight for the whole by that vessel. For want of room in the Victoria, the captain sent seventy-seven of the bales by another vessel, the Albert, which arrived safely in Liverpool. Thirty of the bales were stowed in the hold of the Victoria, and the remaining ninety were

---

* Present, DALY, Ch. J., ROBINSON, and LARREMORE, J. J.

Atkinson v. The Great Western Insurance Company.

carried upon her deck, and in a violent storm were thrown overboard for the preservation of the vessel.

Before the Victoria sailed, a merchant in Charleston, whose firm was acting as agents for the vessel, discovering that the captain was stowing cotton on deck, opposed it, and wanted him to send the cotton by another vessel. He advised the captain of the responsibility he was assuming, and told him substantially, that, as he had signed clean bills of lading, he was bound either to carry the cotton under the deck, or to provide for it on deck by extra insurance; that the insurance taken on a clear bill of lading would not cover cotton on deck. But the captain, notwithstanding this remonstrance, stowed the cotton upon the deck:

This, it is claimed, amounted to barratry on the part of the master, within the legal meaning of that term, in the comprehensive sense in which it has been defined by Lord Hardwicke, as "an act of wrong done by the master against the ship and goods" (*Lewin* v. *Suasso*, Posthelwhaite's Dic'y, Assurance), which is commended by Arnould as the tersest, and, perhaps, best definition of the word (Arnould on Insurance, 821, note h).

This definition of Lord Hardwicke is too general to be of much practical value in determining whether the act of the captain in stowing these ninety bales of cotton upon deck, without providing for the increased peril by extra insurance, was or was not barratry. It was an act of negligence for which he or the owner of the ship may have been responsible, and in that sense was a wrong to the goods or the ship within the language of Lord Hardwicke; but it does not necessarily follow from this that it was what the law denominates barratry. What was said by Lord Hardwicke, moreover, has not the weight of a decision. It was but a general observation. The question in the case was not whether barratry had been committed, for the captain there was the general owner of the ship, which he had bottomried and mortgaged, but of which he had the control and navigation; and the point determined by the court, so far as can be gathered from the imperfect report of the case in an elementary work, was that the owner

of a ship could not, either at law or in equity, be guilty of a barratry concerning the ship.

In the solution of the question before us, therefore, we must look beyond this definition to ascertain the exact legal meaning of barratry, and the inquiry is by no means easy, for it is a question that has greatly perplexed the courts, and from what has been said respecting it, in comparatively recent cases, the meaning of it is nearly as uncertain now as when the question was first agitated in Westminster Hall, one hundred and fifty years ago.

It was considered by the English courts in 1724, in the case of *Knight* v. *Cambridge*, reported in the eighth volume of the Modern Reports, 230, afterward in the second of Ld. Raym. 1349, and again in Strange, 581. In the first report (in 8 Modern), the court is put down as saying that "Barratry is a word of more extended signification than only to include the master's running away with the ship; it may well include the loss of the ship by his fraud *or negligence*;" but in the second edition of the volume it is stated in the margin, that fraud *or negligence* would not have been good; but this was afterwards omitted in the fifth edition, known as the corrected and standard one of the Modern Reports.

In Lord Raymond's report of the case, which is a very brief one, he states that the ground was taken, that, as the owner of the goods has his remedy against the owner of the ship for any prejudice he receives through the fraud or negligence of the master, there is the less reason that the insurer should also be liable to him for the act, as an act of barratry, and that if barratry imports fraud, it does not import neglect; the allegation having been that the ship was lost through the fraud. *and neglect* of the master, a point which the court met by saying, "Barratry imports fraud, and he that commits a fraud may properly be said to be guilty of a neglect, viz., of his duty;" to which the court added the general observation that barratry was not confined to the running away with the ship, "because it imports any fraud." The report in Strange is still more brief, but if correct, more important, because it states that the objection taken was, that the allegation, fraud, *and negligence*

of the master was more general than the word *barratry*, and was, therefore, not *within* the *policy*, and that the court said : "*The negligence certainly* is not, but the *fraud* is." \* \* It further appears in respect to this case, from the argument of Justice Buller, and the statement of Lord Mansfield, in *Vallejo* v. *Wheeler* (Cowp. 143), that the act of the master in *Knight* v. *Cambridge* was sailing without the paying port duties, which Buller argued might have been by accident as well as by design, but which, as it subjected the ship to forfeiture, was held to be barratry. Lord Ellenborough afterward referred to a manuscript note of Mr. Ford, in respect to the question in this case of *Knight* v. *Cambridge*, which, after stating that fraud was barratry, added : " If the master sail out of the port without paying port duties, whereby the goods are forfeited, lost, or spoiled, that is barratry." This Lord Ellenborough thought was probably the question decided upon the trial, and at the argument (*Earl* v. *Rowcroft*, 8 East, 126), and the act of the captain may possibly have been regarded as coming under the category of fraud, upon the ground that the design or effect of it was to defraud the government of the port duties.

The next case was *Stamma* v. *Brown* (Strange, 1173), in which it was held, that a deviation from the voyage by the master for the benefit of the owners was not barratry, although it led to the destruction of the ship and the loss of the goods insured, the court holding, according to the report in Strange, that to make it barratry, *there must be something of a criminal nature*, as well as a breach of contract. In a further account of this case, it is stated that Chief Justice Lee defined barratry to be, "some breach of trust in the captain *ex maleficio*," and said (it being a policy upon goods), " barratry must be *ex maleficio* with intent to destroy, waste, or embezzle the goods," *per* Lord Ellenborough, in *Earle* v. *Rowcroft*, *supra*.

The next case was *Elton* v. *Brogden* (Strange, 1264), in which the crew compelled the captain to return, contrary to his orders. It was *held*, that this was not barratry, for two reasons. 1. That the act of the master was excused by the force which he could not resist. And, 2. Because the ship was not run away with to defraud the owners.

This was followed, in 1774, by *Vallejo* v. *Wheeler*, reported in Cowp. 143, and more fully in Lofft, 631, in which the legal meaning of the word was elaborately discussed; the argument of Alleyn for the plaintiff, as reported in Lofft, being especially distinguished for its research and learning. In the first case (*Knight* v. *Cambridge, supra*), the court said that barratry came from *barat*, signifying *fraus and dolus* (fraud and deceit), for which it would seem, from the marginal note, the court relied upon the glossary of Dufresne and Du Cange, and the French dictionary of Furetiere. In the succeeding case of *Stamma* v. *Brown (supra)*, the plaintiff's counsel cited in support of the same meaning the Italian and Spanish dictionaries, respectively, of *Florio* and *Minshew*, and in support of these lexicographers, Alleyn in *Vallejo* v. *Wheeler*, cited this definition from *Ferrieres Dictionaire de Jurisprudence.* "Barratrie en term de marine est une *tromperie* ou une *malversation* qui se commet par patron, ou capitaine d'un vaisseau, pour faire perdre les marchandises à ceux à qui elles appartiennent." The following from Savary's Dictionaire Universel de Commerce: "Barratrie de patron en terme de commerce et marchandise veut dire les larcins, les desguisemens et alterations des marchandise qui peuvent causer le maitre et l'equipage d'un vaisseau; et generalment toute les *supercheries* et *malversations* quil s'mettent souvent en usage, pour *tromper* les marchand, chargeur et autres qui ont interêst au vaisseau," and gave this definition of the word from Denisart's Collection de Decisions, Nouvelles, etc., relative a la Jurisprudence, a work which had been published but some two or three years before in Paris. "Ce mot signifie malversation et tromperie par un capitain ou patron de navire marchand, dans ce que a rapport a la qualite et a la quantite des marchandises." He also claimed that it meant deceit or malversation in the master, in the ordinances of Louis XIV, article 28, and showed that the ordinances of Rotterdam, number 43, and of Copenhagen, number 38, distinguished between barratry and *neglect*.

Lord Mansfield, in delivering the judgment of the court, declared that the previous English cases did not afford any precise definition of what barratry was; that the nature of it had

not been judicially considered or defined in England with accuracy, and then undertook to inquire into the etymology of the word, which ended by his leaving that inquiry no further advanced than he found it. Justice Aston, however, so far from agreeing with Lord Mansfield, expressed his astonishment that that there should *then* be any doubt as to what was meant by barratry, and declared, as his language is reported in Cowper, that it " comprehended every species of fraud, knavery, or criminal conduct in the master, by which the owners or freighters are injured," and still more strongly as his words are given in Lofft : " I think it (barratry) has always been the same in *idea* and *general meaning*, though differing in terms and not always settled in practice, *deceit, villainy, knavery*, and *fraud*," and the entire court united in the opinion that it is barratry where a master goes out of his course, for the purpose of smuggling for his own benefit, in the course of which deviation the vessel and cargo are injured.

The authorities referred to in this case by Mr. Alleyn show that as barratry was then understood in France, it meant, in general terms, fraud and malversation. But Emerigon, whose work was published some few years after this case was decided, gives it, at least in France, a much more extended signification. He says that it commonly implies the crime of which a captain is guilty in being faithless, or treasonable to his office ; that every fault into which a captain falls is not barratry unless accompanied by deceit or fraud ;. but then, as contradistinguished from this general rule, he adds, still among us (the French), it comprises the case of simple faults, as well as that of fraud ; and relies upon Valin and Pothier for the statement, that, in addition to all kinds of fraud, it embraces simple imprudence, want of care or unskillfulness, either in the master or the crew (Emerigon by Meredith, p. 292). Boulay Paty, in his edition of Emerigon, t. 1, p. 370, says, that the commissioners of the French commercial code intended by barratry only wilful infidelity, or treason to his duty, on the part of the master, or the seamen, but that the Cour Royale of Rennes decided that custom had given the word a more extended meaning, and that it included simple faults.

If such a change has been brought about in France by custom since the adoption of the *Code de Commerce*, in 1807, it has not been the case in this country nor in England, and with us the inquiry as to the meaning of the term is embarrassed by no such consideration. On looking into the authorities, moreover, to which Emerigon refers, I doubt if the question has ever been examined as carefully in France as it has been in England, and the custom referred has probably grown up from the impressions conveyed by the observations of Valin, Pothier and Emerigon, writers who gathered their idea of barratry chiefly, if not exclusively, from what is found respecting it in Le Guidon de la Mer, ch. V, § 6, ch. IX, the unknown author of which compilation had not very clear ideas about it, as Pardessus has pointed out (Us. et Coutumes de la Mer, t. 2; p. 406, a 1, 3, ed. 1847); Pardessus' criticism of the first and third articles of the ninth chapter of Le Guidon being, that the author considers as barratry accidents or events (*evenements*) in which there is not and cannot be any fault in the master, by drawing a distinction between barratry on his part, which is obligatory (*forcée*) or voluntary (*volontaire*), a distinction which the learned commentator declares to be absurd, and as demonstrating that the author did not himself understand the subject upon which he was speaking.

The passages in Le Guidon respecting barratry, upon which Emerigon, Valin and Pothier rely, are, even in the amended text of Pardessus, exceedingly obscure. They may be rendered in English substantially as follows: " Barat or Baraterie ; changes or alterations by the master ; changes which he makes in the vessel or the voyage; deviations, by going to other ports, places or havens; malversations, robberies, larcenies, alterations, disguising the merchandise, all proceeding from the negligence of the master, or the crew ; of which the insurer takes the risk and indemnifies the insured ; with the understanding, however, that if the owner, or his factor, is in a place where he can have justice, it shall be his duty, in the first instance, to proceed against the master, that the damages may be lessened out of the freight before he addresses himself to the insurer " (ch. IX). " On the other hand, if it is found that

the loss or injury was caused from defects in the ship, as if the stays or hatchways were not well fastened or caulked; or the vessel was not staunch, from the want of repair, and through that cause the water entered and destroyed or injured the merchandise, the master bears the loss, which is to be deducted from the freight, without the insurer or the merchandise contributing. And generally the master is answerable for all which arises from his fault, or that of the ship, if he have wherewith to pay, or where the loss did not exceed the freight. If it exceeds, and he has not the means to make restitution, the insured is held to diligence by the law of Baraterie of the Master, and must make it appear that he did all in his power before he can come upon the insured" (ch. V, § 6. Cleriac, Rouen, 1671, pp. 213, 244).

In the early commerce of the Mediterranean and the Baltic, as will appear from numerous passages in the Consolato del Mare and in other primitive maritime codes, the master and the ship were answerable for loss or injury to goods arising from negligence or other culpable cause. And where he was not an owner of the vessel, which he commonly was, in whole, or in part, he was answerable for injuries to it through his fault. After the practice of marine insurance came into use, in the thirteenth century, it was, in some of the maritime cities, customary to hold the insurer responsible for such losses, and in others it was not. And where the insurer was responsible, the practice was, no doubt, as stated in Le Guidon, that he was answerable only where the owner, after due diligence, was unable to obtain indemnity from the master.

Magens, the author of the earliest English treatise upon the law of insurance, published in 1755, after referring to a policy made in Florence in 1523, and another made in Ancona in 1567, under which the insurer was answerable for the barratry of the master, and after pointing out the regulations upon the subject in the ordinances of Stockholm and Amsterdam, and that such a liability existed in the policies which were then, in 1755, made in London and in Antwerp, gives it as his opinion, that the insurers are not answerable, under a barratry clause, for small pilferings or extraordinary leakages proceeding from

bad casks, or where the injury to the goods arises from bad stowage, or by their being put in a place exposed to wet, or from a deficiency in the calking of the decks, or otherwise (1 Magens, pp. 50, 75, 76), showing that at that time negligence of this description was not barratry.    In this connection, however, he refers (p. 51, vol. 1) to an ordinance of Florence, in 1523, which declared that if the goods are stowed on deck with the permission of the insured, then the insurers are not answerable for the damage; but if the master stowed them on deck without the leave of the owner, or of the person who made the insurance, then the insurers shall be obliged to pay, and may have their redress against the master; which is substantially the case now before us. He refers also to another provision in the same ordinance, which he says declares that the insurer shall first pay, and afterward go to law.

The liability of the insurer, in this early Florentine ordinance, is predicated upon the remedy which it is therein recognized he had against the master, after paying the insurance; but the existence of any such remedy, under the system of law prevailing at the present day, there being no privity of contract between the insurer and the master, is denied by the elementary writers upon the law of insurance (2 Phillips on Insurance, 2003).    Lord Kenyon, in a *nisi prius* case (*Bird* v. *Thompson*, 1 Esp. 339), thought that the insurers might maintain an action against the master, when the loss paid by them was occasioned by his barratry.    He admitted, however, that he "knew of no action of that sort ever having been brought," and it has been decided in several well-considered cases, that no such action can be maintained by the insurer against an incendiary, to recover for the loss paid upon a fire policy, or to recover from the person whose negligence was the cause of the death, the loss paid upon a life policy—cases certainly analogous in principle (*Rockingham Insurance Co.* v. *Bosher*, 39 Me. 253; *Connecticut Mut. Ins. Co.* v. *The New York & New Haven R. R. Co.* 25 Conn. 265).

Valin, in his commentary upon the ordinance of Louis XIV, infers that loss or injury arising from any fault or negligence in the master is barratry, and there is certainly a foundation

for that construction in the very general language of the twenty-eighth article of that ordinance, and the opinion of Pothier is to the same effect. But it is to be borne in mind that when Valin wrote his commentary, the maritime law in France had fallen into great neglect (Reddie's Historical View of the Law of Maritime Commerce, part 4, ch. 4, § 6), and that Pothier, by his own admission, had given but little attention to maritime law—indeed, so little, that his inexperience, in the opinion of his editor, Estrangin, involved him in gross and palpable errors (Meredith's Introduction to Emerigon, XIII, XXII, XXVI).

When the full meaning of a word is obscure, or the extent to which it can be applied doubtful, the proper course is to inquire into its origin and history, which, if ascertainable, will generally disclose its exact meaning; for etymology sheds light where all other sources of inquiry fail. This no one of these eminent French writers attempted. Indeed, Emerigon knew so little respecting the term, that he speaks of it as a barbarous word, unknown to antiquity. Such an inquiry at that time was difficult. Sir Allan Park, writing at the close of the last century, said : "The derivations of barratry have rather tended to confound than to throw any light upon the subject; for its root has been so frequently altered, according to the caprice of the particular writer, that it is impossible to decide which is the true one" (Park on Insurance, ch. 5). This is rather an exaggerated statement. The previous inquiries in England had mainly been in the right direction, and the embarrassment even then was not so great as this writer supposed, while the advances that have since been made in philological inquiries enable us to trace the word to its origin, and to show that the English tribunals have been right in the construction they have put upon it, and that the French jurists have expressed opinions upon insufficient information.

It came into use in England, after the conquest, as an Anglo-Norman word, signifying strife, contention or wrangling; being in that sense, as I infer, directly derived from an old French word, *barraté*, signifying the tossing up and

down of the contents in a churn, Cotgraves' French and English Dictionary, London, 1632, and was used in that sense by early English writers in several forms, *barrat, baret, barrette* (Boucher's Glossary ; Coleridge's Dict'y of Old English Words ; Kelham's Norman Dict'y ; Wright's Provincial Dict'y ; Havelok the Dane, *Roxburghe Club Collections;* Owl Nightingale, *Percy Soc. Col.*)

It had also the further meaning of deceit and fraud from another old French word, *barat*, signifying deceit, trickery or cheating, and which, like the other French word, *barrate*, came from a common origin.

From these sources, two words came ultimately into use in England, *barratry* and *barrator*, and Coke, in defining barrator, has left us a very clear idea of the legal meaning of both words. A barrator is, he says, a mover, stirrer up and maintainer of strife in three ways : 1. In disturbing the peace. 2. In taking or detaining the possession of houses, lands or goods, which are in controversy, by *craft* or *deceit.* 3. By sowing calumnies, etc., whereby discord and disquiet ariseth between neighbors (Case of Barratry, 8 Co. 366). We have here both meanings, *strife* and *contention*, and *deceit* or *fraud*, growing out of the compound origin and synonymous use of the word. Indeed, in the sense of strife and contention, it was used in connection with policies of insurance, as late even as the middle of the last century.

Kersey, in his edition, in 1707, of Phillips' New World of Words, gives, as the sole definition of barratry, " a word that is used in policies of insurance for ships, signifying dissensions and quarrels among the officers and seamen," and Martin, in his English Dictionary of 1748, says, barratry " in insurance, signifies dissensions and quarrels among officers and seamen." But Kersey, who published a dictionary of his own, between these periods, incorporates it simply as a law term, as follows : " Barratry (L. T.), when the master of a ship cheats the owners or insurers, either by running away with the ship or embezzling their goods " (Kersey's Dict'y, 3d ed. 1721). In the succeeding and fuller work of Bailey, it is given as a term in commerce, thus : " Barratry, Barretry (in commerce), is the

master of a ship cheating the owners or insurers, either by running away with the ship, sinking of her, or embezzling the cargo" (Bailey's Dict'y, folio of 1736), and this exposition of its meaning has been substantially followed by the lexicographers to the present time. Ash, in his dictionary of 1775, succinctly defines it as "the crime of the ship master who cheats the owners," and Webster, in a more elaborate definition, limits it to a fraudulent breach of duty, a wilful act of illegality or breach of trust, with dishonest views, by the master or mariners, to the injury of owners of the cargo or ship, without the consent of the party insured (Webster's Quarto Dict'y, 1864).

How the same word came to express things so distinguishable from each other as strife or quarreling, and deceit or fraud, is explainable by its origin and history. The root or parent word is to be found in the Sanskrit. It is *Bharat*, meaning *war* (Haughton's Sanskrit Dict'y, Lond. 1833). From this was formed, in the Sanskrit, another word, *Bharata*, meaning an act which is a trespass against morals or justice, or an unjust or immoral action (*Id.*), probably used in its first formation to designate an unjust war, and which afterward acquired, in the Sanskrit, a more general signification; both of which words have survived, and are now in use in the modern Hindustani; the latter slightly modified in form, *bhaari*, *barhi*, *burai*, and with other words formed from it, as *bharam*, *bharamani*, but retaining in their various forms the same general signification, which may be illustrated by a word now in very general use in India, *barakat*, evil (Forbes' English and Hindustani Dict'y; Shakespeare's Hindustani and English Dict'y).

These two primitive words, *Bharat* and *Bharata*, with significations more or less equivalent, are to be found in some form or other in the tongues of all the nations of the Indo-European group that derive their language from this parent source. Thus *barathrum*, both in the Greek and in the Latin, was the name of the pit into which the condemned criminals were thrown, and as a word for pit, dungeon, or the infernal regions, became *barathro* in the Spanish and the Portuguese, and *baratro* in the Italian (Morin Dict'y Etym'y, Paris, 1809;

De Larremendi Dict'y Castellano, &c. S. Sebastien, 1853 ; Ro-
quette Dict'y Portugais, &c. Paris, 1860 ; Landais Dict'y Fran-
cais, &c. Paris, 1834 ; Baretti Diz Italiano, &c. Firenze, 1832 ;
Andrews' Latin Lexicon ; Potter's Grecian Antiquities, b. 1, c.
25). In the Latin, *barratus* was the tumultuous shout of the
Roman or German armies when about to engage (Cole's
Latin and English Dict'y, Lond. 1679 ; Andrews' Latin Lexicon,
*baritus*.)  In the earliest known forms of the tongues that pre-
vailed in France, *barat* was the word in general use for deceit,
cheating, decoying, finesse and trickery, and in this sense was
incorporated in the form of the prayer used by the penitents
in the churches in asking forgiveness.     (Du Cange and
Dufresne's Glossarium, Paris, 1773 ; Menage Dict. Etymo-
logique de la langue Francais, Paris, 1750.)     In old Ar-
morican it meant perfidy.     (Necot. Dict. Francois Latin,
Paris, 1573 ; Menage id.)     In old Breton, *barad* was the
word for treason. (Pelletier Dict. Breton, Paris, 1752.)     In
Provencal *barat, baratel, baratie* and *baratie*, are all words
signifying deceit, or deception.     (Roquefort Glossaire de la
langue Romane, Paris, 1808.     Honnorat, Dict. Provencal,
Paris, 1846.)     The same word, in many forms, was in extensive
use throughout Europe in the middle ages, at the fairs, and in
the rude commerce of the Mediterranean. In the Basque it
was *barata ;* in the old Castilian, *baraja ;* in the Spanish, *bar-
ato* and *barata ;* in the Portuguese, *barata, barateria,* and in
the Italian, *baratta.* (De Larramendi Dic. Castellano Bas-
cuence y Latin, S. Sebastien, 1853 ; Dic. Castellano, Madrid,
1732 ; Vocabalario Acad Della Crusa, Madrid, 1786 ; Da Costa
Dic. Portuguez, &c. Lisbon, 1784 ; Roquette Dic. Portugais,
Paris, 1860 ; Toselli Origine della lingua Italiana ; Florio, Dic.
by Torriano ; Barretti Diz. Italiana ed Inglesi, Firenze, 1832 ;
Diz. Della Lingua Italiana, Bologna, 1820.) In all these lan-
guages, *barat*, or some word formed from it by a change in
the termination, as will appear by the lexicographers above
quoted, meant strife, contention, quarreling, confusion or dis-
order, intentional wrong, deceit, cheating, maliciousness, and
also bartering and selling. It was used in the fairs as a word
descriptive of the strife, noise, and contention that existed in

bartering and trying to get the advantage in exchanging one commodity for another, which was the early mode of trading, and as these noisy marts gave rise to a great deal of the deception, trickery and cheating that may be practised in trade, the word came to be applied also to denote dishonesty in dealing. Thus, we have in the Italian of the period a series of words, expressive alike of, to struggle, to contend, to cheat, to deceive, to barter, to exchange, &c., such as *barratta, barare, baratto, baratare, barateria, baramento,* &c., and the same peculiarity existed in the Spanish, in the Portuguese, and in the French. Menage relates that there was a cattle fair near Lyons, in France, called the fair of *Char-Barat, char* denoting dear or high-priced, and *barat* to cheat; which name, he says, was applied to it, because those who cheated at that fair were not obliged by its regulations to return the animals. (Menage Dict'y Etymologique, &c. *baret.*) The Italian abounds in offshoots of this word of like import, such as *barattiere* corruption, *barattore* a briber, or bribe taker; *baratator* an impostor, *barro,* one who cheats at cards; *baro* a knave, and the Spanish is equally fruitful of words from it of the same kind. (Taboado, Dico Espagnol, &c., Paris, 1838; Velasquez' Spanish Dictionary; Barettis' Italian Dictionary.) In fact, the curious result of this inquiry is, what is frequently illustrated in the history of language, that this word, with its origin so remote, has, during many ages, in the different countries through which it has passed, and amid the many changes in its form, tenaciously adhered to the general signification of the parent words out of which it sprung.

It was first used as a marine term in the Basque; at least the first form of it in that sense, which I have been able to discover, is in that tongue, now one of the oldest in Europe. In the Basque, *bara-baratu* signified delaying a vessel, abandoning her, seizing and giving her over, together with all that followed therefrom, and *baratu-galdu,* stranding, sinking or scuttling her. (Don Pio De Zuaga Dic, by De Larramendi, San Sebastien, 1853.) In the Basque, the original word was *barata,* very little, if at all, changed from the original word in the Sanskrit *bharata,* and the above compounds were formed

from it. The Basque or Biscayanns were an early maritime people, whose rule and language, at one time, extended across the whole of the north of Spain, from the Bay of Biscay to the Mediterranean, and the Spanish word *barar*, which has the same general marine signification, was, according to the Spanish lexicographers, derived from these compound Basque words (De Zuaga, *supra*). From *barar*, therefore, and from *barata*, which has long been and still is in use in Spanish, came, as I suppose, the Spanish word *barateria*, the meaning of which is best expressed in the Spanish definition of it. La perdida causada à los duenos de un barco, ò sus aseguradores por dolo ò malicia del capitan ò tripulacion (Velasquez), the loss or damage sustained by the owners of a ship, or insurers, by the fraud, deceit, artifice or wickedness of the captain or the crew. It was probably formed and first used in Catalònia, in connection with insurance, for the Catalan and the Castilian, the languages of Catalonia, have an admixture of Basque words, and the earliest laws respecting insurance that we know of are found in the ordinances of Barcelona, a Catalonian city ; a city which carried on an extensive maritime commerce with the south of France and with the countries of the East, from the tenth to the sixteenth centuries, and had a judicial tribunal exclusively devoted to maritime law and usage. (Reddie's Historical View of the Law of Maritime Commerce, p. 3, c. 2, § 6—p. 4, c. 2, § 1.) In its marine sense, the word does not appear, as far as I can find, in the early Italian or French dictionaries, a circumstance strengthening the impression of its Catalonian origin.

In *Lockyer* v. *Offley* (1 T. R. 269), Justice Willes, who delivered the unanimous opinion of the court, after stating that many definitions of barratry were to be found in the books, said : "Perhaps this general one may comprehend all cases. Barratry is every species of fraud or knavery in the masters of ships by which the freighters or owners have been injured." In the succeeding case of *Nutt* v. *Bourdien* (1 T. R. 323), Lord Mansfield declared that barratry *must partake* of *something criminal*, and that it must be committed against the owner of the vessel either by the master or the mariners.

In *Havelock* v. *Harrison* (3 T. R. 227), Lord Kenyon simply held that when the master in defiance of his duty took on board certain commodities which subjected the ship to seizure, it was barratry ; and in *Ross* v. *Hunter* (4 T. R. 35), it was decided that it was barratry where the master, after having deviated from his course, left the vessel for a fraudulent purpose, and was never heard of afterward ; there being ground for believing that the vessel had been lost. Bullar, J., in that case, said that " barratry was a question of law arising out of facts," that it was *well settled*, and was in one sense of the word " a deviation by the captain for fraudulent purposes of his own," and that that was " the distinction between deviation, as it was *generally used, and barratry.*"

This observation of Justice Bullar is important, if the distinction made by him is a correct one, as it tends to show that negligence merely is not barratry. Deviation in the law of insurance, in its general sense, is any change or varying of the risk, without necessity or just cause, by which the risk is enhanced (Phillips on Insurance, §§ 977, 979, 460, 984). It means voluntary acts or acts of neglect, not arising from necessity or just cause, and if it does not come within this exception, it is wholly immaterial with what motive the act which is a deviation or a departure is done ; for if, after the risk is assumed, the risk is enhanced or varied, the deviation discharges the policy. This is what Justice Bullar refers to when he speaks of " *deviation* as it is generally used," and the case now before us is a familiar illustration of deviations of this kind, which discharges the policy ; for it is well settled that the exposure of the goods in a greater degree to the perils of the sea, by stowing them upon the deck, is an enhancement of the risk which discharges the underwriter, unless he is notified of it before the risk, or it is provided for in the policy, or the article is one which is generally so carried, or must be from its character (*Lenox* v. *U. S. Ins. Co.* 3 Johns. Cas. 178 ; *Taunton Copper Co.* v. *Merchants' Ins. Co.* 22 Pick. 108 ; *Smith* v. *Mississippi Fire and Marine Insurance Co.* 11 La. 142; *Brooks* v. *The Oriental Insurance Co.* 7 Pick. 259 ; *Blackeit* v. *The Royal Exchange Assurance Co.* 2 Cromp. and Jer. 250 ; *Creery* v. *Holly*, 14 Wend. 25 ;

Phillips on Insurance, §§ 460 and 985). Now the stowing of the cotton upon deck by the master of the Victoria would not, within Justice Bullar's distinction, be barratry, unless it was done by him for some fraudulent purpose of his own, and of this there is no pretense, or anything at least in the evidence that would warrant us in assuming it. In *Moss* v. *Byron* (6 T. R. 379), cruising by the master of an armed merchantman for prizes contrary to the orders of his owner, was held to be barratry, for the reason that, if any loss or accident had happened to the ship during that time, the owners would have been liable to the freighters. It is not, however, a very satisfactory case, nor very well reasoned. A much more important one is *Pryn* v. *The Royal Exchange Ass. Co.* (7 T. R. 505), for there the entire bench, Lord Kenyon and Justices Ashurst, Grose and Lawrence, held, that there must be fraud to constitute barratry. Each judge expressed himself to that effect, and the point may be said to have been directly involved, for it was a deviation from the vessel's course, either from ignorance, negligence, or other cause, which led to her capture, and Lord Kenyon told the jury, that it could not be barratry without a fraudulent purpose in the captain at the time, and he left that question, the existence or not of a fraudulent purpose, to the jury, who found that the deviation was owing to ignorance or something else, but that it was not fraudulent; and the court unanimously refused to disturb the verdict. Lord Ellenborough, in the case already cited (*Earle* v. *Rowcroft*, 8 East, 126), gave as the result of the preceding cases, and what he evidently meant to be a definition, " that a *fraudulent* breach of duty by the master in respect to the owners, or a breach of duty in respect to his owners, with a *criminal intent* or *ex maleficio*, is barratry," and in a subsequent case said, "that the term was large enough to include every species of *fraud* or *malus dolus* committed by the master" (*Boehm* v. *Combs*, 2 M. & Selw. 172). While in *Todd* v. *Ritchie* (Stark. 240), in which the vessel, having sprung a leak, put into the bay of Gaspie, where the master, before any survey had taken place, broke up her ceiling and bows with crow-bars, by which the ship was much injured and weakened; an act relied upon as having been done to procure the

condemnation of the vessel, and, therefore, amounting to barratry, Lord Ellenborough said : "In order to constitute barratry, *which is a crime*, the captain must be proved to have acted against his better judgment," and added, "as the case stands, there is a whole ocean between you and barratry." This, however, was a *nisi prius* case. The facts are not very fully reported, and, without knowing how the case stood upon the evidence, it is not possible to know the exact reasons upon which he relied for non-suiting the plaintiff.

This discrimination is the more necessary, as there are two other cases decided by this eminent judge, which can scarcely be reconciled with this case in Starkie. In *Highman* v. *Parish* (2 Camp. 149), the captain, contrary to his orders, sailed in a foul wind, having before refused to sail when the wind was fair. He disobeyed the instructions of the pilot, and an anchor having been got out, to prevent the ship from going on shore, he cut the cable and allowed the vessel to drift upon the rocks. Lord Ellenborough said, "that, upon this evidence, it was a clear case of barratry," and Park, for the defendant, having suggested that there did not appear to be any fraud, Lord Ellenborough replied, that that was not necessary ; that it had been decided that a *gross* malversation by the captain in his office is barratrous.

In the other case (*Pipon* v. *Cope*, 1 Camp. 434), the vessel was seized in consequence of the mariners smuggling goods on board, and although this was done without the knowledge of the master, Lord Ellenborough held that it was a clear case of *gross negligence* on his part; and that it was his duty to have prevented the repeated acts of smuggling by the seamen; that, by neglecting to do so, he had allowed the risk to be materially enhanced, and by doing so had discharged the underwriters.

This case would seem to have given rise to the impression that, if the loss arises through an act of gross negligence on the part of the captain, it is barratry (*The Patapsco Ins. Co.* v. *Coulter*, 3 Pet. U. S. 234; *Lawton* v. *The Sun Mutual Ins. Co.* 2 Cush. 500; Park on Insurance, 84, 2 Am. ed.) As the correctness of this will be hereafter considered, it may be well here to distinguish precisely what was decided in this case,

which was simply this: that a master of a vessel cannot recover the insurance under a policy containing a barratry clause, where the loss arose through barratrous acts of the mariners, which might have been prevented by a proper exercise of vigilance on his part.

It will not be necessary to follow consecutively the succeeding English cases, for they all conform substantially to the exposition of barratry given in the decisions that have been examined. The last of these, however, is a very important one (*Gill* v. *General Iron Screw Collier Co.* Eng. Law Rep. 1; C. P. 600; in error, 3 *Id.* 476), for there a collision arose from the steersman of a vessel starboarding the helm, contrary to the regulations of the merchants' shipping act of 17 and 18 Vict. ch. 104, and although the statute declared that if any damage should arise from the non-observance of the regulations, it should "be deemed to have been occasioned by the *wilful* default of the person in charge of the deck of the ship." The court held that this was not a loss arising from barratry; that it did not appear what was *the extent of the default* in improperly starboarding the helm, which may have been anything from simple negligence to actual malfeasance; that there was therefore no proof of barratry but for the statute, and that the statute was not passed to decide such questions, but merely to regulate ships and the rights of ship-owners, as between themselves.

This case may be regarded as distinctly excluding from barratry what the law denominates negligence, for the judge at the trial, left it to the jury to say whether the collision which caused the loss of the goods was occasioned by the negligence of the defendant's crew, and the jury found specially that there was negligence on the part of the defendant's vessel. As barratry was among the excepted perils in the bill of lading, the defendants insisted that it was error in the judge not to distinguish in this case between *ordinary* and *gross* negligence, upon the assumption, as I infer, that if the collision arose from gross negligence it was barratry, a loss for which the defendants were not answerable. But the court refused to disturb the verdict upon any such ground, holding that *gross* in connection with negligence was a mere word of description, and not a definition, and

that no meaning could be attached to it in connection with the case before the court.

*Lloyd* v. *The same defendants* (3 H. & Colt. 284), was a case arising also out of the same collision, which came before the Court of Exchequer upon the pleadings. The averment in the declaration there was that the collision and consequent injury was caused by and through the *gross carelessness*, negligence, mismanagement, and improper conduct of the defendants, their servants and *mariners;* an averment upon which the defendants relied, as showing that the loss was within the excepted perils, one of which was " barratry of master or mariners ; " but the court held, in effect, that it was an averment of a loss by negligence, and not by barratry; Bromnall, J., distinguishing that there might be wilful negligence and yet not barratrous; that barratry implies a secret and fraudulent act against which the ship-owner cannot guard; whereas negligence may be prevented by employing a skilful master and proper mariners.

The cases in our own State are to the same effect. In *Grim* v. *The Phœnix Ins. Co.* (13 Johns. 451), the vessel being, as in the case now before us, fully laden, 36 kegs of gunpowder were stowed in the cabin, close up to the companion way, the plank of which toward the binnacle being but half an inch thick, and the plank of the binnacle but an inch thick. The candle in the binnacle, having burnt down to the socket on a stormy night, and the socket being too hot to put another candle in it immediately, a seaman, as it was blowing hard at the time, stuck the candle temporarily against the side of the binnacle, which, within twenty minutes, set the binnacle on fire, and before the fire could be extinguished, the vessel blew up, killing every one on board, except one passenger. Here there was negligence on the part of the master in stowing the gunpowder close up to the companion way adjoining the binnacle, where a lighted candle was kept constantly throughout the night, and gross carelessness in the seaman, whose act was the proximate cause of the destruction of the vessel. The negligence of the master in that case was of the same general character as the negligence of the master in this. It was an act of improper stowage, and was, like the negligence in this case, the

remote, though not the direct, cause of the loss; the direct cause here being the jettison, and there the fire.  Barratry was one of the perils insured against, and it was claimed that the negligence there established, as it is claimed that the negligence here establishes, a loss by barratry.  Indeed, that case was even stronger than this, for there the negligence of the mariner co-operated with the previous negligence of the captain in bringing about the loss.  But the court said that it was "impossible to consider the negligence by which the loss was occasioned as amounting to barratry;" that it was " well settled that an act to be barratrous must be done with a fraudulent intent or *ex maleficio*."  In *The American Ins. Co.* v. *Bryan* (26 Wend. 578), Senator Verplanck said, that barratry must mean and include all fraud, knavery, breach of trust, or *other criminal conduct* of the master or mariners, whereby the owner or freighter suffers loss, or the subject insured is destroyed; and Chancellor Kent, in his commentaries, defines it, to the same effect, but more precisely, as meaning " fraudulent conduct on the part of the master, in his character as master, or of the mariners, to the injury of the owner, and without his consent, and includes every breach of trust committed with dishonest views " (3 Kent's Com. 4th ed. 305).

It is clearly deducible, from these cases, that a loss arising from what in law is denominated negligence is not barratry. But Justice Johnson declared, in *Patapsco Ins. Co.* v. *Coulter* (3 Pet. U. S. 234), that negligence itself, when gross, is evidence of barratry.  Park, in his work on insurance, says, that any act of the master or mariners, which is grossly negligent, tending to their own benefit to the prejudice of the owners of the ship, and without their consent and privity, is barratry (Park on Insurance, 2d Am. ed. 84).  Chief Justice Shaw says, in *Lawton* v. *The Mutual Ins. Co.* (2 Cush. 500), that the act must be wilful and not caused by negligence, unless the negligence be so gross as to amount to fraud, and Phillips includes in the general definition of barratry, very gross and culpable negligence in the master or mariners, contrary to their duty to the owner, and that might be prejudicial to him or to others interested in the voyage or adventure (1

Phillips on Insurance, 1062). This has led to a renewed misapprehension of barratry, by coupling negligence with it. The effect of using such a term as "gross negligence" is to mislead; for in the science of the law there is no such thing as degrees of negligence. There may be degrees of care, as more care is required in certain cases than in others, and it has become the habit to distinguish between slight, ordinary and great care; but, whatever may be the degree or amount of care demanded in the particular instance, it is the neglect to bestow it which is expressed in the law by one word, "negligence." (See the cases cited in Am. Law Review, vol. 5, pp. 39, 40.)

The legal meaning of negligence has, in a recent elementary work (Shearman and Redfield on Negligence, ch. 1), been comprehensively and very accurately defined, as including every breach of trust not clearly *intentional*, as signifying the want of care, caution, attention, diligence or discretion in one having no positive intention to injure; consisting either in the careless performance of obligations assumed by contract, or the neglect of those which are imposed by law; and barratry, as has been shown, means much more than this. As a marine term, it means an intentional injury to the vessel or to the cargo; or some unlawful, fraudulent, or criminal act, whereby, or in the prosecution of which, loss or injury arises to the owners of the vessel, or of the cargo, or to the insurers, and does *not* embrace what in the law is denominated negligence. So far, therefore, as the plaintiffs seek to recover under the policy, for a loss arising from barratry, this action cannot be maintained.

It is now settled in the law of insurance, that if the proximate cause of the loss was the peril insured against, and the remote cause was some act of negligence on the part of the master or of the mariners, the underwriters are liable, as where fire is one of the perils insured against, and the fire which produced the loss is attributable to an act of negligence in the master or any of the crew. (See the cases collected in Phillips on Insurance, § 1096.) Here the proximate cause was the jettison, and the remote one the negligence of the master, in stowing the cotton upon deck, and a loss by jettison was one of the perils insured against. But I do not understand that

this rule applies where there has been a deviation or departure, producing a change of risk so material as to discharge the underwriters from the policy ; for where they insure goods upon a clean bill of lading, there is an implied warranty that the goods are or will be stowed in the usual and ordinary manner, which is in the vessel's hold, and if this is not done, but the goods are carried on deck, except in a case where that is justifiable, the policy never attaches, for the reason that it is a greater risk than the underwriter agreed to take (1 Phillips on Insurance, §§ 460, 686, 704 ; 1 Arnould on Insurance, 213, Am. ed. ; *Lennox* v. *The U. S. Ins. Co.* 1 Johns. Ch. 178 ; *Smith* v. *Wright*, 1 Car. 44 ; *Wolcott* v. *Eagle Ins. Co.* 4 Pick. 429). Goods carried upon deck are not within the protection of the policy, nor can there be any claim for contribution upon a general average, if they are jettisoned, except in the cases where they are generally or must necessarily be so carried ; or where it is done with the knowledge and implied consent of the underwriter, which was not the case here.

The plaintiffs, therefore, have no cause of action against the underwriters upon the policy. The only remedy is an action against the master or his principal for the damages sustained through the negligence of the master in carrying the cotton upon deck.

The verdict, therefore, should be set aside, and a new trial ordered.

Judges ROBINSON and LARREMORE concur.

New trial ordered.